## AFFIDAVIT

I, Juan Carlos Razon, being first duly Sworn, hereby depose and state as follows:

INTRODUCTION

1. This affidavit is also made in support of an Application for a Search Warrant for the following persons and properties- including their common areas, and appurtenances:

   a. **MARC DURE's** ("DURE") residence at 18 Tecumseh Street, Apartment 4, Providence, Rhode Island ("TARGET PREMISES 1"), and further described in Attachment A-1, for the items described in Attachment B-1.

   b. **MARC DURE's** white Hyundai Sonata ("TARGET VEHICLE 1"), Rhode Island registration 1IW608, and further described in Attachment A-2, for the items described in Attachment B-2.

   c. **MARC DURE's** mailing address at 35 East Drive, Apartment 2B, Providence, Rhode Island ("TARGET PREMISES 2"), and further described in Attachment A-3, for the items described in Attachment B-3.

   d. **MARC DURE's** secondary address at 12 Rankin Avenue, Providence, Rhode Island ("TARGET PREMISES 3"), and further described in Attachment A-4, for the items described in Attachment B-4.

   e. **COTY ELDRED's** ("ELDRED") residence at 1119 Douglas Avenue, Apartment 15, North Providence, Rhode Island ("TARGET PREMISES 4"), and further described in Attachment A-5, for the items described in Attachment B-5.

   f. **COTY ELDRED's** garage at 143 Mineral Spring Avenue, Garage / Basement, Pawtucket, Rhode Island ("TARGET PREMISES 5"), and further described in Attachment A-6, for the items described in Attachment B-6.

   g. **JOHN DAILEY's** ("DAILEY") residence at 86 Edgemere Avenue, Apartment 1, Providence, Rhode Island ("TARGET PREMISES 6"), and further described in Attachment A-7, for the items described in Attachment B-7. *First Floor Only* [handwritten]

h. **JOHN DAILEY's** vehicle, a white Dodge Durango ("TARGET VEHICLE 2"), New York registration KBR3916, and further described in Attachment A-8, for the items described in Attachment B-8.

i. **CALVIN TAVAREZ's** ("TAVAREZ") residence at 8 Thomas Avenue, Apartment 1, Pawtucket, Rhode Island ("TARGET PREMISES 7"), and further described in Attachment A-9, for the items described in Attachment B-9.

j. **PEDRO FABERLLE's** ("FABERLLE" or TARGET PERSON 1)", and further described in Attachment A-10, for the items described in Attachment B-10.

k. **CHARLES LASSITER's** ("LASSITER") residence at 685 Charles Street, Apartment 1, Providence, Rhode Island ("TARGET PREMISES 8"), and further described in Attachment A-11, for the items described in Attachment B-11.

l. **ROBERT HOGAN's** ("HOGAN" or "TARGET PERSON 2") person, year of birth (YOB): 1982, and further described in Attachment A-12, for the items described in Attachment B-12.

m. **ROBERT HOGAN's** residence at 26 Becker Street, Johnston, Rhode Island ("TARGET PREMISES 9"), and further described in Attachment A-13, for the items described in Attachment B-13.

n. **ROBERT HOGAN's** vehicle, a 2019 black Chevy Truck ("TARGET VEHICLE 3") bearing the Rhode Island registration: 1FK712, and further described in Attachment A-14, for the items described in Attachment B-14.

o. **CARLOS RODRIGUEZ's** ("RODRIGUEZ") residence at 298 Pawtucket Avenue, Apartment 6, Pawtucket, Rhode Island ("TARGET PREMISES 10"), and further described in Attachment A-15, for the items described in Attachment B-15.

I also submit this affidavit in support of an arrest warrant for RODRIGUEZ, who is known to reside at TARGET PREMISES 10 and is further described in Attachment A-15.

## AGENT BACKGROUND, TRAINING, & EXPERIENCE

2.  I am a Special Agent of the Federal Bureau of Investigation ("FBI") United States Department of Justice and have been employed in that capacity since March 2020. I am currently assigned to the Rhode Island Safe Streets Gang Task Force (hereinafter, the "Task Force") and investigate violent street gangs and drug/firearms trafficking organizations operating in and around the State of Rhode Island. Prior to my employment with the FBI, I served in the United States Navy from 2011-2016 and I worked as a Law Enforcement Officer in the City of Norfolk, Virginia from 2016-2020, where I worked in a capacity as a uniformed patrol officer and a Detective investigating violent street crimes in and around the city of Norfolk.

3.  I am a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41 (a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

4.  I have received training in the field of narcotics and firearms enforcement and investigations. I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal firearms and drugs. I have been the affiant on dozens of affidavits in support of search warrants, arrest warrants, Title III Wiretaps, GPS location warrants and other applications. Through my training, education and experience, I have become familiar with the manner in which illegal narcotics and firearms are transported, stored, and distributed, and with the methods of payments for such items.

5. Additionally, based on my training and experience and my participation in other controlled substance investigations, I know that it is common for drug dealers to "front" (provide on consignment) controlled substances to their customers; conceal contraband, the proceeds of drug sales, and store drugs/firearms and cash in remote locations sometimes referred to as "stash houses;" maintain records of drug and gun transactions; and use cellular telephones to facilitate their illegal distribution operations. I also know that drug/weapons trafficking is an illicit business and an ongoing process requiring the development, use, and protection of a communication network to facilitate daily drug distribution. Drug dealers use various methods to thwart law enforcement detection, including frequently changing cellular phones and vehicles, using various aliases, and uses coded communications. Based on my experience in drug and firearm investigations, I know that traffickers frequently refer to illicit drugs and guns in guarded conversations and frequently use code words when referring to controlled substances or money.

6. Based upon my training and experience and my participation in this investigation, I know that:

    a. Drug traffickers often places assets, including apartments, houses, vehicles, and telephones, in names other than their own to avoid detection of these assets by government agencies. Although these assets are held in other names, the drug dealers actually know or use these assets and exercise dominion and control over them. Records relating to these assets are frequently found in their residences and other locations controlled by them.

    b. Person involved in drug trafficking conceal in their vehicles, residences, and businesses; controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug

transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending money made from engaging in narcotic trafficking activities. Money, tangible property and records relating to these assets are frequently found in their residences and other locations controlled by them.

      c.     Drug traffickers often carry, on their person or maintained in secure locations, weapons to protect themselves and their controlled substances from theft by other users, traffickers, or criminals, and from seizure by law enforcement agencies. Drug traffickers store these weapons in their residences, vehicles, and/or businesses and stash houses, or other locations controlled by them.

      d.     Drug traffickers commonly maintain addresses or telephone numbers in books, papers, computers, cellular telephones and other electronic data storage devices, and other information that reveals the names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if that information may be in code. Records and electronic devices of this sort are frequently found on the persons of drug traffickers or in their residences, motor vehicles, and other locations controlled by them.

      e.     Drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, or their property. Records in the form of photographs and/or videos are often found in the residences, offices, or other places under the control of drug traffickers, and provide valuable evidence of the conspiratorial relationships. Records of this type are sometimes in hard copy, but are increasingly found stored on computers, cellular telephones, thumb drives, and other items possessing the capability of storing electronic data.

      f.      Drug traffickers often keep equipment and materials for packaging, cutting, weighing, manufacturing, and distributing controlled substances in their homes, stash houses, or other locations controlled by them. That drug paraphernalia often includes, but is not limited to, scales, plastic wrap, plastic bags, surgical gloves, presses, and cutting agents as well as aromatic substances such as soap, dryer sheets, wood shavings, and heat sealers, which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug detection dogs. Large-scale drug traffickers sometimes use money counting machines to help count and sort the proceeds of drug trafficking.

      g.      Drug traffickers commonly consign controlled substances and weapons to their clients and couriers. They frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. Records of this type are kept in location where traffickers have ready access to them, including on their person or in their residences, vehicles, businesses, stash houses, and smart telephones, tablets, and personal computers. Drug and gun traffickers also normally maintain these items and records for long periods of times, regardless of whether their value to the dealer has diminished. Oftentimes, this type of evidence is generated, maintained, and then forgotten about. Thus documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer. Oftentimes, these individuals do not even realize the incriminatory nature of the documents they keep. Documentary evidence dating back years is sometimes found in residences and other locations controlled by traffickers.

      h.      Persons who reside in or who are using a particular residence will often have documents, bills, and correspondence that list their names and addresses in that residence. Documents such as personal telephone books, address books, utility company receipts, keys, personal letters, rent receipts, mortgage documents, clothing, and other articles of personal property would tend to establish residency at a particular location and provide valuable evidence concerning ownership and control over areas in which drugs or other incriminating evidence are found. Records and documents of this type may also be found in hard copy or stored electronically on computers, mobile telephones, and other media that stores data electronically.

7.     I also know that individuals who possess firearms will often keep them in their vehicles and in their homes. I know that firearms, unlike drugs are often kept for lengthy periods of time, months and years, and are often more difficult to acquire and aree generally kept longer than narcotics.

BACKGROUND, METHODS & MEANS

8.     This investigation was initiated by the FBI Rhode Island Safe Streets Gang Task Force ("the SSGTF"). This affidavit is based on my own investigation and on information reliably provided to me by other federal, state, and local law enforcement agents in Rhode Island. I have relied on information supplied by Agents, Troopers, Detectives, and Officers from the FBI, Drug Enforcement Agency ("DEA"), United States Postal Inspector Service ("USPIS"), Rhode Island State Police, Providence Police Department, Woonsocket Police Department, Central Falls Police Department, West Warwick Police Department, Cranston Police Department, Pawtucket Police Department, and the United States Marshal's Office. I have also relied on reports of investigations that I have prepared or that were prepared by other law

enforcement agents; business records, and public and/or law enforcement databases. I have also relied on information provided to me and to other law enforcement agents by a Cooperating Witness who I will refer to only as "CW-1."

9. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in relevant part only.

*Cooperating Witness #1*

10. A Cooperating Witness (hereinafter, "CW-1") has been providing the FBI with information regarding ELDRED since approximately April 2023. CW-1 has been compensated with monetary payments for his cooperation in this investigation thus far and will continue to be paid for his cooperation in this investigation. CW-1 has a criminal history that includes, theft, breaking and entering, possession of stolen goods, obstruction, narcotics violations, traffic violations, possession of a weapon, and domestic violence offenses. CW-1 has served jail time for breaking and entering, domestic violence, theft, and driving offenses and has been found to be in violation probation. CW-1 is currently on bail for a pending felony offense. He was recently investigated by law enforcement for theft and was found to be in possession of narcotics and agreed to cooperate with law enforcement. CW-1 was not charged with the possession or theft offense. Since the start of his cooperation, CW-1 has provided me with information that I

or other law enforcement agents have independently corroborated through toll records, physical surveillance and other law enforcement confidential sources. CW-1 is willing to testify in this investigation and has communicated with ELDRED by phone calls and text messages in the presence of law enforcement. On each occasion, CW-1 communications with ELDRED were monitored and recorded by myself or another member of law enforcement. CW-1 has participated in controlled purchases of narcotics from ELDRED that were monitored and recorded. CW-1 knows ELDRED as a person from whom he can purchase fentanyl pills. Prior to the start of the investigation, CW-1 showed members of law enforcement photos of ELDRED, whom the CW-1 knows as "Coty," and identified him as a supplier of fentanyl pills. In order to protect CW-1's identity, I will refer to CW-1 with a masculine pronoun regardless of CW-1's gender.

*Confidential Source #1*

11.     A Confidential Source (hereinafter, "CS-1") provided the government information regarding ELDRED in November 2023. CS-1 was arrested in November 2023 and provided the information during a post-arrest interview. CS-1 has a criminal history that includes, possession of stolen vehicle parts, bank fraud and forgery, felony assault with a dangerous weapon, weapons violations, traffic violations, possession of a weapon, violation of no contact order, and domestic violence offenses. CS-1 has served jail time for domestic violence, weapons violations, felony assault with a weapon, and has been found to be in violation probation. CS-1 is currently incarcerated for a violation of a no contact order. During CS-1's arrest he asked to speak with law enforcement and was consensually interviewed by law enforcement for the purpose of leniency and assistance with his ongoing violation of no contact order. The information provided by CS-1 during the interview is information that I or other law enforcement agents have

independently corroborated through toll records, physical surveillance and other law enforcement confidential sources. CS-1 is not willing to testify in this investigation and has been intercepted on the ongoing Title III investigation where he has communicating with ELDRED by phone. CS-1 knows ELDRED as COTY and knows him to be a marijuana and crack-cocaine dealer. I will refer to CS-1 in masculine pronouns, regardless of CW-1's gender.

*Controlled Purchases*

12.     Over the course of this investigation, CW-1 has participated in 12 controlled purchases of narcotics from ELDRED. In each case, CW-1 arranged the drug deal by contacting ELDRED at the either the Dropped Phone 1 ("DP1"), Dropped Phone 2 ("DP2"), or 401-212-3997 ("TARGET TELEPHONE #1 or TT1"). On each occasion, the contact was by text messages, phone calls, or both, and a quantity of narcotics was ordered. The calls made by CW-1 were recorded and conducted in the presence of myself or another participating law enforcement officer. The text messages sent and received by CW-1 were photographed by me or another participating law enforcement officer. On each occasion, law enforcement investigators checked CW-1 for contraband prior to the transaction to be sure that he was not already in possession of any narcotics, and that he did not have any additional cash on his person. CW-1 was then supplied with only enough official government funds for the purchase of the amount of narcotics that had been ordered. In addition, CW-1 was equipped with an audio and video recorder for all controlled buys in which he participated. CW-1 was followed to the transaction sites, and surveillance was maintained near those locations. Following each transaction, CW-1 was followed to a predetermined meeting location where he turned over the narcotic evidence to me or another law enforcement officer working on this investigation. In each case, CW-1 was debriefed, and the audio and video recording devices were retrieved and reviewed. Additionally,

a field test was performed on all of the drugs that had been purchased. In every instance, the field tests returned a positive indication for the presumptive presence of the drug that was purchased.[1] Whenever I use the term "controlled purchase" in this affidavit, this is the procedure that we followed.

13. After each controlled purchase, the drugs were secured as evidence and have been submitted to the DEA Northeast Laboratory.

| Date | Order or payment arranged through: | Drug | Amount of pills: | Gross Weight (g): | Amount Paid: | Delivered by: | Location of Delivery: | Phones Used: |
|---|---|---|---|---|---|---|---|---|
| 4/10/2023 | Coty Eldred | Fentanyl Pills | 50 | 6.3 | $400 | Coty Eldred | 673 Smith St., Providence, RI | DP1 |
| 4/18/2023 | Coty Eldred | Fentanyl Pills | 500 | 74.4 | $3,000 | Coty Eldred | 60 Joseph St., Providence, RI | DP1 |
| 4/25/2023 | Coty Eldred | Fentanyl Pills | 500 | 52.4 | $2,840 | Coty Eldred / Marc Dure | 60 Joseph St., Providence, RI / 200 Whittier Ave., Providence, RI | DP1/TT2 |
| 5/22/2023 | Coty Eldred | Fentanyl Pills | 200 | 24.6 | $1,150 | Coty Eldred / Marc Dure | 987 Chalkstone Ave., Providence, RI | DP1/TT2 |
| 6/7/2023 | Coty Eldred | Fentanyl Pills | 1000 | 168.1 | $4,000 | Coty Eldred / John Dailey | Vincent Avenue, Pawtucket, RI | DP1/DP2/ (401) 359-4736 |

---

[1] The suspected fentanyl from each of these transactions has been submitted to the Rhode Island State Laboratory and/or the Drug Enforcement Administration Northeast Laboratory for further testing. To date, results have been received for three of the controlled purchases (4/10/2023, 4/25/2023, and 10/23/2023). All of the results returned with a positive result for the presence of fentanyl.

Page 11 of 112

| 6/21/2023 | Coty Eldred | Fentanyl Pills | 1000 | 170.1 | $4,000 | Coty Eldred / John Dailey | 151 Douglas Pike, Smithfield, RI | DP2 / (401) 359-4736 |
|---|---|---|---|---|---|---|---|---|
| 7/12/2023 | Coty Eldred | Fentanyl Pills | 1000 | 121.9 | $4,250 | Coty Eldred / Marc Dure | Texas Avenue, Providence, RI | DP2/TT2 |
| 8/16/2023 | Coty Eldred | Cocaine | N/A | 29.0 | $740 | Coty Eldred | Samoset Avenue, Providence, RI | DP2 |
| 8/25/2023 | Coty Eldred | Fentanyl Pills | 1000 | 129.0 | $4,250 | Coty Eldred / Marc Dure | 614 Pawtucket Avenue, Providence, RI | TT1 / TT2 |
| 10/23/2023 | Coty Eldred | Fentanyl Pills | 1000 | 99.2 | $4,250 | Coty Eldred / Pedro Faberlle | 672 Plainfield Street, Providence RI | TT1 / (774) 415-3546 |
| 10/31/2023 | Coty Eldred | Fentanyl Pills | 1000 | 147.65 | $4,250 | Coty Eldred/ Carlos Rodriguez | 216 Broadway Pawtucket, RI | TT1 / (401) 499-4334 |
| 10/31/2023 | MARC DURE | Half / Half | N/A | N/A | N/A | Charles Lassiter to Mark Kelley | 560 Mineral Spring Avenue, Pawtucket, Rhode Island | TT2 / (401) 390-4097 / (401) 309-3858 |
| 11/2/2023 | Marc Dure | Fentanyl | N/A | 30 | N/A | Calvin Tavarez | Rankin Avenue, Providence, RI | TT2 / (401) 919-9941 |
| 11/2/2023 | Marc Dure | Cocaine | N/A | 100 | N/A | Calvin Tavarez | Rankin Avenue, Providence, RI | TT2 / (401) 919-9941 |
| 11/12/2023 | Marc Dure | Fentanyl Pills | 1500 | N/A | $2,625 | John Dailey | 85 Power Road, Pawtucket, RI | TT2 / (401) 548-4736 |
| 11/27/2023 | Coty Eldred | Fentanyl Pills | 500 | 69.5 | $2,260 | Coty Eldred/ | Fisk Street, Providence, RI | TT1 / (401) 499-4334 |